**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BARRY GENTRY,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 10-2350** |
| | : | |
| **LANCASTER COUNTY, et al.,** | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                             **September 4, 2014**

Plaintiff Barry Gentry filed this civil rights complaint pursuant to 42 U.S.C. § 1983 seeking money damages arising from several incidents that took place while he was incarcerated at the Lancaster County Prison ("LCP").  Count One asserts a "failure to protect and bystander liability" theory; Count Two asserts an excessive force claim; and Count Three asserts a custom, policy, pattern, and practice claim.[1]  Defendants have filed a motion for summary judgment, accompanied by a Statement of Facts ("DSOF"), seeking the dismissal of the "John Doe" defendants named in the Complaint, and asserting that Plaintiff has failed to produce evidence to support his claims for liability. Gentry has responded with an Answer to the DSOF and has filed his own Statement of Facts ("PSOF").  Defendants have not filed any response to the PSOF.  Gentry stipulates to the dismissal of the John Doe defendants, but asserts there are genuine issues of material fact preventing the entry of summary judgment as to all other Defendants.  For the reasons that follow, summary judgment is entered in favor of all Defendants on

---

[1] By stipulation of the parties, Count Four, alleging deliberate indifference to serious medical needs, was dismissed.  <u>See</u> Document #10.

Counts One and Three, but the Motion is denied as to Count Two's claim for excessive force.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing relevant portions of the record, including depositions, documents, affidavits, or declarations, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c).  Summary judgment is therefore appropriate when the non-moving party fails to rebut the moving party's argument that there is no genuine issue of fact by pointing to evidence that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992).

2

## III.    FACTS

The following facts can be deemed undisputed from the summary judgment record, either because Gentry has admitted the truth of a Defendants' assertion, or because Defendants have failed to refute an assertion by Gentry.  See Stengel J., Policies and Procedures, Section II-C-4 (Rule 56 Motions) ("All material facts set forth in the statement [of material facts] required to be served by the moving party may be taken by the court as admitted unless controverted by the opposing party.")

Gentry entered LCP on April 30, 2008, to serve a one year sentence for his conviction on charges of simple assault, fleeing a police officer, and driving while under the influence.  (DSOF ¶ 3.)  Gentry was assaulted by another inmate, Timothy Lynch, on November 13, 2008, when Lynch escaped from his cell.  (Id. ¶¶ 5-6.)  A second incident occurred on July 15, 2009, involving inmate Rayshaun Hill and several Defendant corrections officers.  (Id. ¶ 7; Def. Ex. A ("Gentry Dep.") at 211-12).  Gentry asserts that excessive force was used upon him during the second incident while he was being handcuffed by Corrections Officers Coco, Mennotti, and Williams.  (Id. ¶ 8.)  Gentry asserts that, during the second incident, Defendants Ritter, Jacobs, and Showalter watched and did nothing.  (Id. ¶ 9.)

### A.  The Lynch Incident and the Failure to Protect Claim

At the time of the first incident, Gentry was housed in cell number 2 on cell block C-2, the discipline block, as punishment for a misconduct he received for returning late from his work release program.  (Id. ¶ 14; Gentry Dep. at 85-95).)  Inmate Lynch was housed in cell number 36 on C-2.  (Id. ¶ 15; Gentry Dep. at 98).)  On November 13,

2009, Gentry came out of his cell for a medical check.  (Id. ¶ 16.)  Lynch, who was not supposed to be out of his locked cell, got his cell door open and a physical altercation ensued between Lynch and Gentry.  (Id. ¶17.)  Sergeant Paul Wolfe and C.O. Rockefeller separated Lynch and Gentry.  (Id. ¶ 18; Gentry Dep. at 121-22.)  The corrections officers broke up the fight within a minute or two.  (Id. ¶ 19; Def. Ex. B ("Betancourt Dep.") at 25, 84).)

Lynch was able to get out of his cell because the door was broken.  (Id. ¶ 20; Gentry Dep. at 142).)  Inmate Brandon Bentancourt and Inmate Dileef Strickland testified that Lynch could "pop open" the cell door by lifting the door up and pulling it to the side. (PSOF ¶¶ 167-169; Betancourt Dep. 27; Pl. Ex. B ("Strickland Dep.") at 23.)  Strickland testified that an inmate named Bruce had complained to the corrections officers prior to the incident that Lynch's cell door was broken, and complained again to a corrections officer on the second shift about the Lynch cell being broken, but corrections officers did nothing about it.  (Id. at ¶¶ 171, 176; Strickland Dep. at 25-26, 32-33).

Lynch testified that other inmates knew that he could open his cell and get out. (Id. at ¶ 183; Pl. Ex. D ("Lynch Dep.") at 14.)  Inmates Matthew Smith and Edwin Boyer also testified that they knew that Lynch's cell door could be opened by the prisoner inside of that cell.  (Id. ¶ 184-85; Pl. Ex. A ("Smith Dep.") at 36-37; Pl. Ex. G ("Boyer Dep.") at 11-12.)  Boyer saw individuals in the cell pulling it and opening it up.  (Id. ¶ 186; Boyer Dep. at 12).

Andy Kotrick, a Maintenance II mechanic at LCP for twenty five years, repaired Lynch's cell door after the incident, along with fellow employee Tom Dissinger.  (Id. ¶

189-190; Pl. Ex. I ("Kotrick Dep.") at 5, 13-15.)  Kotrick testified that a light in the guard

station would alert corrections officers to the fact that there was problem with a cell door.

If a light was green, it would indicate that the cell door was open; after repairs to Lynch's

cell door were performed, Kotrick and Dissinger checked the guard station, and

determined that there was no problem with the lights. (Id. ¶ 191; Kotrick Dep. at 16-17.)

Kotrick testified that he had encountered similar problems with other cells doors

malfunctioning, and that this could result in either the cell door not opening or not

closing.  (Id. ¶ 192; Kotrick Dep. at 19-20.)  If the cell door would not close, the panel in

the corrections officers' cage would alert them to that.  (Id. ¶ 193; Kotrick Dep. at 20-21.)

 Gentry did not know Lynch's cell was broken before the incident occurred.

(DSOF ¶ 21; Gentry Dep. at 142.)  Although Defendants assert that none of the inmates

told the corrections officers that Lynch's cell was broken prior to November 13, 2008,

(see DSOF ¶ 23), Gentry has presented evidence through Inmate Strickland's testimony

that at least one inmate notified the staff about Lynch being able to open his own cell.

(Strickland Dep. at 39-41.)  The testimony of Andy Kotrick establishes that the

corrections officers on duty had the means to learn that the cell door was broken.

 The evidence is disputed whether Gentry made any complaints about Lynch to any

of the corrections officers prior to November 13, 2008.  (See DSOF ¶ 24; Gentry Dep. at

101 ("Q.  Did you make any complaints about Mr. Lynch to any of the corrections

officers before your physical altercation with him? . . .  A.  No, because I had not had  a

confrontation with him, no."); but see id. at 106 (Q:  Did you ever tell any corrections

officer about this behavior [Lynch throwing urine and feces soaked toilet paper at

Gentry]?  A.  Yes.  Q.  Who did you tell?  A. I told [Defendant CO] McMullen.");  id. at

142 ("I told them [the warden and assistant warden] exactly what was going on.  I told

him he had threatened my family and other things.  And the guards could hear it.")

Betancourt Dep. at 28 ("Q.  Did Mr. Gentry ever complain about that [Lynch throwing

urine and feces soaked toilet paper at Gentry] to the corrections officers?  A.  All the

time.  Every time they came on the block, he used to stop them, yell at them, tell them,

yo, man, he won't stop.  He told them all the time.")  Gentry testified that he also

complained to C.O. Jacobs.  (Gentry Dep. at 112-14.)

There is disputed evidence whether, prior to November 13, 2008, Gentry wrote a

general purpose request form complaining about Lynch's behavior.  (See Gentry Dep. at

99 ("Q.  Did you ever write a general purpose request form complaining of Mr. Lynch's

behavior towards you?  A.  No. . . .  Q.  Why didn't you ever put it in writing?  A.  Well,

it hadn't accelerated to that level."); but see id. at 128 ("I wrote to the warden.  Are you

talking about after the incident or before the incident?  Q.  At any point in time about the

incident; did you?  A.  Yes.  Yes, I did."); id. at 130 ("[CO Shepos] said, well, you need

to write to the warden and assistant warden. . . .  But he went personally and got me the

request slip.  And I filled it out and I wrote to him.").  There is also disputed evidence

whether Gentry admitted in his deposition that he had no problems or concerns with Mr.

Lynch prior to the physical altercation on November 13, 2008.  (See Gentry Dep. at 100

("Q.  All right.  Before that physical altercation, did you have any problems with Mr.

Lynch?  A.  No, other than I knew something was wrong with him."); but see id. at 106

(Q:  Did you ever tell any corrections officer about this behavior [Lynch throwing urine

and feces soaked toilet paper at Gentry prior to the physical altercation]?  A.  Yes.  Q. Who did you tell?  A. I told [Defendant CO] McMullen.");  id. at 111 ("I spoke to Officer Jacobs, and I told him what was going on after I tried to stop a lot of supervisors that were going by, and they ignored me.")  Gentry's prison mental health services provider, Bonny Bair, testified that Gentry never complained to her about how he was being treated while incarcerated at Lancaster County Prison.  (Def. Ex. C, Bonnie Bair Dep., at 13-14.)

Gentry has presented evidence that Lynch had violent tendencies, had threatened him prior to November 13, 2009, that he had alerted guards, but that the guards ignored him.  Inmate Bentancourt testified that Plaintiff had a very poor relationship with Lynch and Boyer, and the guards knew about the abuse of Plaintiff by these inmates. Bentancourt testified that Lynch and Plaintiff were always arguing, and that he witnessed Lynch continuously threw things into Plaintiff's cell.  (Bentancourt Dep. at 27-28, 32). Two weeks prior to the incident with Lynch, Gentry was verbally and emotionally tormented by Lynch and other prisoners, and Bentancourt heard other inmates threatening to kill Gentry's family.  (Bentancourt Dep. at 40-42.)  Bentancourt saw Inmate Boyer, who was friends with Lynch, also throw things into Plaintiff's cell, including wet paper towels.  (Bentancourt Dep. at 50-51.)  Bentancourt never heard Gentry taunt or make fun of Lynch, and Plaintiff was always pleading with Lynch to leave him alone. (Bentancourt Dep. at 28, 55).  However, Lynch continued to throw urine and feces into Plaintiff's cell, and Strickland witnessed how Lynch was encouraged by other inmates to bother Gentry because these other inmates did not like Plaintiff and they wanted him off the block.  (Bentancourt Dep. at 73-74, Strickland Dep. at 20-22).

Earlier on the day that Lynch attacked Plaintiff, Inmate Strickland heard Lynch threaten Gentry, stating that he was going to beat him up, and he heard him cursing at Plaintiff, saying that he was going to do things to him.  (Strickland Dep. at 30). Strickland testified that Lynch would throw urine and feces at Plaintiff through the bars of the cells three times a week, although it never appeared to Strickland that Plaintiff was provoking Lynch.  (Strickland Dep. at 74-79).

Gentry testified that he asked both Boyer and Lynch to stop throwing urine and feces at him; the guards were stationed only sixty feet away from his cell; they must have known what was going on; and they allowed it to happen.  (Gentry Dep. at 102-104). Plaintiff confirmed that Lynch and Boyer threatened his family; that Boyer stated that he was going to rape his daughters and that he was going to get somebody to do it; and said that he was going to shoot up Plaintiff's house.  (Id. at 105.)

Inmate Bentancourt testified that the guards treated Plaintiff differently, wrote him up for things, and singled him out where other prisoners would not have been written up or singled out.  (Bentancourt Dep. at 58).  He stated that Gentry was not popular with the corrections officers because he complained to them that they were picking on him and singling him out, and often told Bentancourt about the way he was being mistreated by the guards.  (Id. at 69-70, 86).  Bentancourt heard Gentry complaining to the corrections officers about Lynch, and about the fact that Lynch was throwing things into his cell. However, the corrections officers did nothing to stop this.  (Id. at 28-29).  Bentancourt confirmed that Plaintiff also wrote numerous general purpose request forms complaining about Lynch.  (Id. at 29-30.)  Bentancourt also heard Plaintiff complain to the guards that

he wanted to be moved out his cell because of Lynch was throwing things at him, but the corrections officers did nothing because they did not like Gentry.  (Id. at 30-31). Bentancourt testified that the guards had to be able to hear the other inmates threatening Gentry because Gentry's cell was near the guard station.  (Bentancourt Dep. at 42-43). He stated that Gentry continuously attempted to tell the guards about the harassment, including a corrections officer named "Sonya" and Corrections Officer Steenberger, but the guards would ignore him or laugh at him.  (Id. at 47-49).

Inmate Strickland testified that Plaintiff complained constantly to the corrections officers about Lynch throwing things into his cell.  However, when Plaintiff complained to the corrections officers about the way Lynch was treating him, the corrections officers would tell him to stop complaining and to stop being a snitch.  (Strickland Dep. at 28). Strickland heard Plaintiff complain to the corrections officers that Lynch was throwing things at him, trying to take his meal trays, and threatening him and his family, but the corrections officers did nothing about it, brushed Plaintiff off, and told him to stop snitching.  (Id. at 35-39; 69; 89-90.)

**B. The Hill Incident and the Use of Excessive Force Claim**

Dr. Robert Shambaugh is the mental health supervisor at LCP.  (Pl. Ex. F ("Shambaugh Dep." at 7.)  He recalled Rayshaun Hill, who had been housed for a time in the prison Mental Health Unit ("MHU") as a result of an altercation with another inmate. (Id. at 33-34).  He recalled that Hill had learning disabilities, and he may have had a mood problem.  (Id. at 35.)  In July 2009, Dr. Shambaugh exchanged emails with Deputy Warden Siemasko regarding Hill's mental condition and where he should be housed.  (Id.

at 35-37).  Dr. Shambaugh testified that prison records reflected that Hill was severely

mentally retarded, and vulnerable to manipulation and to being taken advantage by other

prisoners.  (Id. at 38-42).  Shambaugh characterized Hill's mental retardation as "severe"

— even though that term is not a clinical description — because he wanted to emphasize

to the corrections officers that he Hill was mentally ill and he "wanted something to

happen about it."  (Id. at 41.)  Hill's records reflected further that mental health providers

at the prison expressed concern with his disciplinary situation, and questioned why he

was in the general population at the time that he assaulted Gentry, because he had such

severe mental problems.  (Id. at 42-43).  Dr. Shambaugh testified that, although he made

decisions regarding whether prisoners should be housed in the MHU or the general

population, he could be overruled by prison officials.  (Id. at 46.)  Indeed, Deputy

Warden Siemasko overruled him regarding recommendations he made as far as where an

inmate should serve misconducts.  (Shambaugh dep., 46-47).

Rayshaun Hill struck Gentry several times in the face on April15, 2009.  (DSOF ¶

34; PSOF ¶ 257; Def. Ex. D ("Hill Dep.") at 22-27.  Earlier, Gentry had witnessed Hill

having oral sex with another prisoner, and Plaintiff told corrections officers about it.

(PSOF ¶ 258; Gentry Dep. at 212-213).  Corrections Officer David Anderson separated

Plaintiff and Hill.  (Id. ¶ 260; Gentry Dep. 219-220).  After Anderson broke up the fight,

Defendant Corrections Officers Coco, Mennotti, and Williams handcuffed Gentry and put

him face down on a table to keep Hill from spitting on Gentry.  (DSOF ¶ 37; Hill Dep. at

54.)  Gentry testified in his deposition that Coco, Mennotti, and Williams slammed his

head into the table at least four or five times, after he had been handcuffed.  (Gentry Dep. at 220-221).

There is disputed evidence whether Defendants were trying to injure Gentry during the April 15, 2009 incident.  Hill testified that that the guards were trying to protect Gentry from him because, he testified, "I like to spit on people.  So they thought I was going to spit on them. . . .  I think Gentry do got asthma.  I think when he on the table trying to get up, they got him, boom, he just on the table.  I ain't going to sit here and say they were trying to hurt him.  I can't say they was."  (Hill Dep. at 54.)  Gentry testified that he never fought back; that all three corrections officers slammed his head into the table; and that, although Hill had punched him three times, he did not begin to bleed from his face until the corrections officers began slamming his face into the table, resulting in him needing three stitches.  (Gentry Dep. at 221-224.)  Hill, however, testified that Gentry was bleeding after Hill struck him.  (Hill Dep. at 32.)  Hill testified that, while he was fighting with corrections officers, he observed the corrections officers pick Plaintiff up, although he was not struggling with them.  (Hill Dep. at 23-24.)  According to Hill, Gentry was not resisting the guards who assaulted him, and who slammed his head into the table.  (Hill Dep. at 53-54).

Gentry testified that, following the Hill attack/alleged excessive force incident, he complained to Major Klinovski about what had occurred.  (Gentry Dep. at 225-26.) Defendant Klinovski showed him part of a video tape, which purportedly showed the beating by Hill, but Klinovski stopped the tape and did not show him the portion that

contained the beating by the corrections officers.[2]  (Id.)  Gentry assumed, by complaining

to Major Klinovski, that action would be taken by him to rectify the situation.  (Id. at

226).  He testified that he told Major Klinovski that the corrections officer had slammed

his head into the table, but Klinovski did not want to talk about the attack by the guards;

he only wanted to talk about Rayshaun Hill, and he tried to blame the whole incident on

Hill.  (Id. at 226-227).  Gentry stated that he did not ask that charges be filed against

Coco, Mennotti, and Williams, because he did not trust Major Klinovski, believing that

Klinovski was covering up for the corrections officers.  (Id. at 230, 232).  During a

second meeting with Major Klinovski, Gentry testified that he attempted to describe the

corrections officers' assault upon him, but Klinovski did not want to listen and kicked

Gentry out of his office.  (Id. at 256-258).

After Plaintiff was moved to cell block G-2, he had a conversation with C.O.

Anderson, who originally broke up the fight with Hill.  (Id. at 236.)  Gentry confronted

Defendant Anderson about a report which Anderson had prepared about the incident, and

Plaintiff accused Anderson of lying.  (Id. at 238.)  According the Gentry, Anderson

admitted that the filed his report because he "did what they told me to do, referring to his

supervisors; Showalter, Ritter, and the one on the block, Jacobs.  He said, I wrote what

they told me to write."  (Id.)  Gentry testified that Anderson admitted that he saw the

other corrections officers slam him into the table three to four times and said he didn't

---

[2] It has been held that, where a videotape completely refutes an inmate's claims that
excessive force was used against him, and the video evidence does not permit an inference that
prison officials acted maliciously and sadistically, summary judgment is appropriate.  Tindell v.
Beard, 351 F. App'x 591 (3d Cir. 2009).  Notably, neither party has submitted the videotape as
part of the summary judgment record.

know why they did that since they had the situation under control.  (Id. at 239-42.)

Gentry testified that Defendants McMullen and Mennotti attacked him because he had

prior problems with them, and because he had written to the warden to complain about

them.  (Id. at 243-50, 252-56.)  Gentry asserts that Anderson lied in his report of what

had occurred in the Hill incident, and he lied because he wrote what he was told to write.

(Id. at 264).

Gentry testified that the misconduct reports prepared by the corrections officers

falsely asserted that Plaintiff refused to be handcuffed.  (Id. at 262-64.)  He stated that he

never refused the corrections officers' directives, did not interfere with staff duties, and

the only thing he said to them was that he did not do anything.  (Id. at 264-265).  Gentry

testified that he sued Warden Guarini and LCP because of the history of corrections

officers assaulting inmates.  (Id. at 268-69.)  Gentry stated that he spoke with Warden

Guarini following the Lynch incident and told him that he needed to make himself "more

visible" and that Guarini was unaware of what went on in the prison.  (Id. at 159.)

Regarding other named defendants, Gentry testified that:  Lieutenant Ritter was also on

the block when the other corrections officers attacked Plaintiff (id. at 276-77); C.O.

Showalter was also on the block, did nothing to help Gentry, and told C.O. Anderson to

lie in his report (id. at 276-277);  McMullen, Coco, and Sergeant Jacobs were also present

on the block during the Hill incident (id. at 266-67).  He sued C.O. Barley because he lied

when he told Gentry's probation officer about the Hill incident.  (Id. at 274.)  Gentry

admits that none of his claims assert that Barley violated his civil rights.  (Pl. Ans. To

DSOF at ¶¶ 41-44.)  He sued Sergeant Jacobs and C.O. Trudeau because he complained

to them about Lynch prior to Lynch's assault and they did nothing about it.  (Gentry Dep. at 274-75.)  He sued C.O. Wolfe because he rubber stamped a false report concerning the Lynch assault.  (Id. at 276.)

## IV.   THE FAILURE TO PROTECT CLAIM

In failure to protect cases, prison officials are liable pursuant to § 1983 when a plaintiff has been assaulted by another inmate if there was "intentional conduct, deliberate or reckless indifference to the prisoner's safety, or callous disregard on the part of prison officials."  Davidson v. O'Lone, 752 F.2d 817, 828 (3d Cir. 1984).  A supervisory prison official is liable for his own deliberate indifference to the violation of a prisoner's civil rights where the official had knowledge of unconstitutional practices promulgated against the prisoner and the official failed to act on that knowledge.  See Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989); Baker v. Monroe Twp., 50 F.3d 1186, 1194 (3d Cir. 1995) (denying police supervisor's summary judgment motion where sufficient evidence existed as to supervisor's actual knowledge of and acquiescence to subordinates' use of excessive force).  The threshold question "'is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  Eichelman v. Lancaster Cnty., 510 F. Supp. 2d 377, 389 (E.D. Pa. 2007) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8 (1998)).  To the extent that Plaintiff's claim is based upon the failure of corrections officers to intervene in the physical altercations between Gentry and Lynch and Hill, courts have held that a defendant officer has a duty to take reasonable steps to protect a victim from another's use of force only if there is a realistic and reasonable opportunity

14

to intervene.  See Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002) (liability for failure of one police officer to intervene in excessive force by another officer) (citing Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986) (instructing the district court upon remand to determine whether the officer was in a position to intervene);  Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972) (liability for failure to intervene exists only if the beating occurred in the officer's presence or was otherwise within his knowledge).  Accordingly, to survive summary judgment on Count One's failure to protect claim, it was incumbent upon Gentry to come forward with sufficient evidence to show that a named defendant (1) engaged in conscience shocking conduct that (2) was deliberately, recklessly, or in callous disregard to Gentry's safety.

Defendants first argue that Count One is subject to summary judgment because Gentry has failed to adduce evidence that the named Defendants — Jacobs, McMullen, Trudeau, Klinovski, Guarini, Wolfe, Coco, Mennotti, and Williams — failed to take reasonable measures to ensure that Gentry's health, wellbeing, and safety were protected. They argue that Gentry has admitted that no one on C-2 block informed any Defendant that Lynch's cell was broken before November 13, 2009, the date that Lynch opened his own cell and assaulted Plaintiff.  They assert that the only evidence was that Gentry complained about Lynch throwing urine and feces at him — acts that they assert are insufficient to constitute a substantial risk of serious harm.  Regarding the Hill incident, they argue that Gentry has failed to produce evidence that any Defendant had a reasonable opportunity to intervene and refused to do so.

Gentry responds that the Lynch assault aspect of his failure to protect claim is broader than just the manner in which Lynch escaped his cell to assault him.  He argues that he has presented evidence that Defendants knew or had reason to know that Lynch threatened him and was able to open his own cell door.  He also points to extensive evidence that Defendants ignored (1) his complaints about Lynch, (2) Lynch's violent tendencies, (3) Lynch's threat to Plaintiff's family, made within earshot of Defendants who had to have overheard the threat, (4) that Lynch had been verbally and emotionally torturing him for two weeks prior to the incident, and (5) his requests to be moved away from Lynch.  Regarding the Hill incident aspect of his claim, he points to evidence that Defendants knew of Hill's tendency for violent behavior, and his mental health issues, and improperly failed to house him in the MHU.

I conclude that summary judgment must be entered on the failure to protect claim as to all named Defendants (Jacobs, McMullen, Trudeau, Klinovski, Guarini, Wolfe, Coco, Mennotti, and Williams).  In the Lynch incident, while Gentry showed that Lynch could get out of his cell, and that a corrections officer on duty at the time could tell from his guard station that the cell door was not secured, the evidence cited by Plaintiff regarding Count One's failure to protect claim fails to establish a genuine issue of material fact that a particular named defendant was on duty at the guard station, had knowledge of Lynch's actions toward Plaintiff, and could have reasonably intervened to protect Lynch from the assault.  Similarly on the Hill incident, Gentry has failed to identify specific named defendants that failed to protect him from Hill.  Rather, he has shown only that prison officials failed to house Hill in the MHU, when prison

16

psychologists made such a recommendation.  This is insufficient to meet Plaintiff's summary judgment burden.  Determining where a prisoner is housed is an issue of internal security for which prison officials are due significant deference.  See Turner v. Safley, 482 U.S. 78, 89 (1987) (holding that a prison regulation, policy, or action that impinges on an inmate's constitutional rights is nonetheless valid if it is "reasonably related to legitimate penological interests."); Veney v. Wyche, 293 F.3d 726, 732-33 (4th Cir. 2002) (holding that decisions relating to the accommodation of inmates, such as cell assignments, are the type of day-to-day judgments that rest firmly in the discretion of prison officials; Brown v. Byrd, Civ. A. No. 00-3118, 2000 WL 1780234, at *5 (E.D. Pa. Dec. 1, 2000) (defendants' policy of assigning cells based on perceived compatibility withstands Turner scrutiny in that it is reasonably related to the prison's legitimate penological interests in the safety and security of its prison).

The only evidence on Count One against Defendant Jacobs is that Gentry complained to him about Lynch and he did nothing about it; he instructed Anderson to lie in his report; Jacobs had problems with Gentry because he had written to the warden to complain him; and Jacobs was present on the block during the Hill incident.  These allegations do not satisfy Plaintiff's summary judgment burden.  Receiving an inmate's generalized complaint about another inmate and failing to act on cannot be deemed to be conscience shocking behavior where, notably, Gentry has failed to specify the nature of his complaint to Jacobs, and whether it was made before or after the incident.  Jacobs' mere presence during the Hill inmate on inmate assault is not evidence of a realistic and reasonable opportunity to intervene.  The allegation that Jacobs instructed Anderson to lie

17

may be conscience shocking, but it occurred after the incident and does not speak to a failure to protect.

The evidence against McMullen — that Gentry made complaints to him about Lynch and he was also present on the block during the Hill incident — is insufficient for the same reasons.  The only evidence against Trudeau — that Gentry complained to him about Lynch prior to Lynch's assault and he did nothing about it — is also insufficient to meet Gentry's summary judgment burden on Count One.  Likewise, Plaintiff has failed to adduce any evidence that Defendants Wolfe, Coco, Mennotti, Williams, engaged in conscience shocking behavior in failing to protect him from other inmates.  While Gentry testified that Ritter and Showalter were on his cell block when the other corrections officers attacked Plaintiff and did not help him, Count One alleges liability only regarding a failure to protect from inmate on inmate violence.  See Compl. ¶ 41 (alleging Defendants "encouraged, condoned, facilitated and permitted verbal and physical attack [sic] upon the Plaintiff by other inmates.")

The evidence against Klinovski all relates to his conduct after the excessive force incident.  There is no evidence of conscience shocking behavior on his part regarding the failure to protect claim arising from either the Lynch assault or the Hill assault.  As a supervisory official, Klinovski may only be liable for his own deliberate indifference to a violation of Gentry's civil rights, based upon his knowledge of unconstitutional practices, and his failure to act on that knowledge.  Thus, I conclude that Gentry has also failed to meet his summary judgment burden on his Count One claim against Klinovski.  The evidence against Warden Guarini is that Gentry spoke with him following the Lynch

18

incident and told him that he needed to make himself "more visible" and that Guarini was unaware of what went on in the prison.  This evidence is insufficient to meet Gentry's summary judgment burden to show that this supervisory official had knowledge of other Defendants' failures to protect Plaintiff from Lynch before the incident took place and failed to act on that knowledge.

Accordingly, summary judgment is granted on Count One as to all Defendants.

## V.    THE EXCESSIVE USE OF FORCE CLAIM

Defendants Coco, Mennotti, and Williams argue that they are entitled to summary judgment because there is insufficient evidence that they used excessive force on Gentry in breaking up the Hill assault.  They argue that the use of force was necessary to protect Gentry from Hill, and that Plaintiff has not proved any injury was inflicted upon him as a result of the actions of corrections officers since he was struck by Hill four times before Defendants broke up the assault.  They also assert that the amount of force used against Gentry was de minimus, Hill's misconduct created the need for the application of force, and the amount of force actually used was reasonable to regain Plaintiff's compliance and protect him from Hill.  Finally, they assert they are entitled to qualified immunity

The Eighth Amendment prohibits cruel and unusual punishment, which includes the unnecessary and wanton infliction of pain by prison officials.  U.S. Const. amend. VIII; Whitley v. Albers, 475 U.S. 312, 319 (1986).  The Eighth Amendment restrains prison officials from applying excessive force against inmates, Hudson v. McMillian, 503 U.S. 1, 5 (1992).  Courts evaluate whether or not force was applied maliciously to cause harm by evaluating several factors including:  (1) the need for the application of force;

(2) the relationship between the need for force and the amount of force actually used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of a forceful response.  Whitley, 475 U.S. at 321.  The focus of the inquiry is "driven by the extent of the force and the circumstances in which it is applied; not by the resulting injuries."  Smith v. Mensinger, 293 F.3d 641, 648 (3d Cir. 2002).  The Eighth Amendment does not protect an inmate against objectively de minimus use of force.  Hudson, 503 U.S. at 9-10 ("[T]he Eighth Amendment's prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional recognition de minimus uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'") (quoting Whitley, 475 U.S. at 327 (citations omitted)).  Thus, when considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. 386, 396-7 (1989).  Moreover, in the context of prison excessive force claims, in determining "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson, 503 U.S. at 6-7, "even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he caused . . . , any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'" Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).  When "it appears that the evidence, viewed in the light most favorable to the

20

plaintiff, will support a reliable inference of wantonness in the infliction of pain," summary judgment is inappropriate.  <u>Whitley</u>, 475 U.S. at 322.

Even if it may be found that government officials, such as police officers, violated a plaintiff's civil rights, they are extended qualified immunity in actions brought under section 1983 "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Messerschmidt v. Millender</u>, 132 S.Ct. 1235, 1244 (2012) (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009)).  "'Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.'"  <u>Id.</u> at 1245 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987)).

Gentry has adduced evidence in the form of his own testimony that Corrections Officers Coco, Mennotti, and Williams handcuffed him and put him face down on a table to keep Hill from spitting on him; that they slammed his head into the table at four or five times after he had been handcuffed; that he did not fight being handcuffed, resist the guards who assaulted him, refuse the Defendants' directives, or interfere with staff duties; only asserted that he had not done anything; and that, although Hill had punched him three times, he did not begin to bleed from his face until the corrections officers began slamming his face into the table, resulting in him needing three stitches.  He also adduced evidence through Inmate Hill's testimony that, while Hill was fighting with corrections officers, he observed the corrections officers pick Plaintiff up, although he was not

struggling with them, that Gentry was not resisting the guards who assaulted him, and that the Defendants slammed Gentry's head into the table.

Application of the five excessive force factors leads to the conclusion that Gentry has met his summary judgment burden to create a triable issue on the reasonableness of the force exerted by Defendants.  While it is undisputed that the need for force was occasioned by Hill's assault and the need of Defendants to separate the two inmates and restore order, there is a genuine dispute of fact on the relationship between the need for force and the amount of force utilized.  Both Gentry and Hill testified that Plaintiff was not struggling with Defendants and did not resist being handcuffed.  They also both testified that the force was applied after Gentry had been handcuffed.  There is also disputed evidence on the extent of the injury Defendants' inflicted, with Plaintiff stating that he did not begin to bleed until after Defendants exerted force.  Viewed in the light most favorable to Gentry, the extent of the threat to the safety of staff and inmates was already in abeyance when Defendants slammed his head into the table, since both Hill and Plaintiff had already been handcuffed.  While the act of subduing the two inmates and the alleged use of excessive force was probably one continuous event, Gentry has presented evidence sufficient for a reasonable jury to find that a responsible corrections officer would not have slammed Gentry's head into a table several times after he was handcuffed.  Finally, given Plaintiff's evidence, it cannot be said that Defendants made efforts to temper the severity of their forceful response, or that their use of force was de minimus.

For these same reasons, Defendants are not entitled to summary judgment based on qualified immunity.  A reasonable jury could conclude that slamming Gentry's head into a table several times after he was handcuffed was not objectively reasonable assessed in light of the legal rules of excessive force that were clearly established at the time.

## VI.    THE <u>MONELL</u> CLAIM

Count Three alleges a policy, custom, pattern, and practice claim against LCP and Warden Guarini.  Gentry has identified the following allegedly unconstitutional policies, customs and practices:  permitting inmates to throw feces and urine at other inmates; condoning and inciting inmate taunting and fighting; encouraging or condoning inmate on inmate violence by failing to ensure that cell doors are properly maintained; ignoring incidents of inmate on inmate violence; condoning staff use of excessive force; failing to train staff to prevent inmate on inmate violence; unjustly issuing misconduct citations to the victims of inmate on inmate violence, and writing false reports to cover up actions of assaulting corrections officers and/or inmates; and failing to ensure that inmates are treated humanely.[3]

A municipal body or other local governmental unit such as Lancaster County, not part of a state for Eleventh Amendment purposes, may be a "person" subject to suit under 42 U. S.C. § 1983. <u>Monell v. Dep't of Soc. Serv.</u>, 436 U.S. 658, 690-91 (1978) ("Congress did intend municipalities and other local government units to be included

---

[3] Gentry also included in his Complaint an allegation that Defendants had a custom and policy of failing to provide adequate and timely medical treatment to victims of inmate on inmate violence.  (Compl. ¶ 51(I).)  However, he makes no argument concerning such a policy in his response to Defendants' Motion.

among those persons to whom § 1983 applies.")  Counties, "like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."  Id.; Board of Cnty. Comm'rs of Bryan Cnty., OK v. Brown, 520 U.S. 398, 403-07 (1997); Roman v. Jeffes, 904 F.2d 192, 196-97 (3d Cir. 1990).

However, it has been repeatedly held that a local government unit may not be subjected to § 1983 liability on a theory of respondeat superior.  Bryan Cnty., 520 U.S. at 403; City of Canton v. Harris, 489 U.S. 378, 392 (1989); Pembaur v. Cincinnati, 475 U.S. 469, 478-79 (1986); Monell, 436 U.S. at 691; Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996).  Rather, "a plaintiff seeking to impose liability on a municipality under § 1983 [is required] to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  Bryan Cnty., 520 U.S. at 403; Beck, 89 F.3d at 971.  In Bryan Cnty., the United States Supreme Court elaborated on the showing required for municipal liability under § 1983, stating:

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Id. at 404; see Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir.1996).

A <u>Monell</u> claim arises if a plaintiff demonstrates that the "'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" <u>Woodyard v. Cnty. of Essex</u>, 514 Fed. App'x 177, 181 (3d Cir. 2013); <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting <u>Monell</u>, 436 U.S. at 690-91). A "policy" is a "statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." <u>Brown v. Muhlenberg Twp.</u>, 269 F.3d 205, 215 (3d Cir. 2001) (quoting <u>Monell</u>, 436 U.S. at 690). A "custom," on the other hand, need not have received formal approval through official decision-making channels, <u>Monell</u>, 436 U.S. at 690-91, but it "must have the force of law by virtue of the persistent practices" of municipal officials. <u>Brown</u>, 269 F.3d at 215 (quoting <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 167 (1970)). A <u>Monell</u> claim also requires proof of a direct causal link between the custom or policy and the resulting deprivation. <u>Bryan Cnty.</u>, 269 F.3d at 214.

Defendants argue that Gentry has produced no evidence of any custom, much less a permanent and well settled custom, that Lancaster County condoned or failed to investigate inmate on inmate violence, the throwing feces and urine by inmates, improperly maintained cell doors, the use of excessive force by staff, or had a policy of failing to train staff to prevent inmate on inmate violence, not to issue improper misconduct citations to the victims of inmate on inmate violence, or not to writing false reports to cover up actions of assaulting corrections officers and/or inmates. They assert that evidence of Gentry's experiences at LCP alone does not establish a custom, policy, or failure to train claim.

I conclude that Gentry has failed to meet his summary judgment burden on Count Three.  First, Gentry makes no argument that the summary judgment record supports his claims that Lancaster County condoned improperly maintained cell doors, the use of excessive force by staff, or that it had a policy of failing to train staff to prevent inmate on inmate violence, not to issue improper misconduct citations to the victims of inmate on inmate violence, or not to write false reports to cover up actions of assaulting corrections officers and/or inmates.  Accordingly, Defendants' Motion will be granted as to these alleged policies.  Plaintiff does assert that he has presented evidence that the throwing of feces and urine by inmates on cell block C-2 occurred on a regular basis, and to testimony of fellow inmates that guards not only condoned inmate fighting but encouraged it.  (Pl. Mem. at 40.)  He also points to evidence that Defendant Klinovski ignored his complaints about inmate on inmate violence.  (Id.)

The evidence Gentry has adduced is insufficient under the holding of Bryan Cnty., where the Supreme Court admonished that "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  Id., 520 U.S. at 404.  Gentry's evidence shows only his own experiences at LCP; that he was the subject of inmate on inmate violence, and that staff ignored his complaints about other inmates.  This evidence does not show a prison-wide custom or policy, nor the requisite degree of culpability necessary to establish a Monell claim.  The anecdotal testimony of other inmates, that prison officials condoned or encouraged inmate on inmate violence, is also insufficient to show a persistent practice.

26

The only evidence of actual inmate on inmate violence was the two incidents in which Gentry was involved.  In both those instances, staff members did not condone or encourage the violence, but took immediate action to restore order.  Accordingly, Defendants are entitled to summary judgment on Count Three.

An appropriate Order follows.